UNITED STATES of America, Plaintiff-Appellee,

v.

D. Y. DUNN, Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

Stanley W. FIZER and Bobbie Baum Darnell, Defendants-Appellants.

Nos. 14474, 14475.

United States Court of Appeals Sixth Circuit.

Feb. 27, 1962.

N. Mitchell Meade, Asst. U. S. Atty., Lexington, Ky. (Jean L. Auxier, U. S. Atty., John W. Morgan, Asst. U. S. Atty., Lexington, Ky., on the brief), for plaintiff-appellee.

Charles W. Swinford, Lexington, Ky. (Stoll, Keenon & Park, Lexington, Ky., on the brief), for defendant-appellant, Dunn.

Amos H. Eblen, Lexington, Ky. (Eblen, Howard & Milner, Lexington, Ky., on the brief), for defendants-appellants, Fizer and others.

Before MARTIN, McALLISTER and O'SULLIVAN, Circuit Judges.

O'SULLIVAN, Circuit Judge.

Defendants-Appellants were indicted for, and convicted by a jury of, conspiracy (Title 18 U.S.C.A. § 371) to violate § 1010, Title 18 U.S.C.A. (making false and fraudulent statements in a Federal Housing Administration transaction), and of substantive violations. The conspiracy was charged in Count I. In Counts II and III, defendant Bobbie Baum Darnell was charged with substantive violations of said § 1010; in Count IV, defendants Darnell and D. Y. Dunn were charged, together, with a substantive violation of such section; and in Count V, defendant Stanley Fizer was charged with a substantive violation of such section. The substantive violations described in Counts II through V were among the overt acts described in the conspiracy count.

The indictment and its charges grew out of an application by Darnell for an FHA insured loan of $12,900.00 from Franklin Pioneer Corporation of Lexington, Kentucky. In the forms and material which were a part of Darnell's application he made the following representations, to wit: that he had made an offer to purchase from defendant Dunn a house and lot (1856 Clays Mill Road, Lexington, Kentucky) for the price of $16,400.00 on certain conditions set forth in such offer to purchase; that he had made a $3,500.00 cash down payment on such purchase price; that his annual income (base pay) was $7,100.00; and that he intended to occupy the premises offered as security. The indictment charged that all of these representations were false. Defendant Dunn's alleged offense was his signing, as acceptor, the offer to purchase and making it available for Darnell's use (Count IV). Defendant Fizer's charged offense was his signing of an allegedly false verification that Darnell's annual income was $7,100.00 (Count V).

Defendants were found guilty—all under Count I (conspiracy), as well as Darnell under Counts II, III, and IV, Dunn under Count IV and Fizer under Count V. Each was sentenced to prison for a term of a year and a day on each of such counts, the sentences to run concurrently.

Defendant Stanley W. Fizer, 62 years of age, a life long resident of Lexington, was, and had been for thirty years, en-

gaged in the plumbing and heating business. He was the sole proprietor of Stanley Fizer Heating Service. From 1954 to 1958 he was President and principal shareholder of Better Builders, Inc. Defendant Bobbie Baum Darnell, 38 years old, was and had been for twenty years employed by the Fizer concern. During the times involved he was also a minority shareholder and the Secretary and Treasurer of Better Builders, Inc. Defendant D. Y. Dunn, 69 years old, had been engaged in the real estate and building business since about 1950, following his retirement after twenty years as county school superintendent of Fayette County, Kentucky. At the times involved, he was a shareholder and Treasurer of Fayette Builders, Inc., a house building enterprise. So far as the record discloses, none of the defendants had any previous criminal record.

In 1955, Fayette Builders, Inc., had conveyed three building lots to Better Builders, Inc., in consideration for Better Builders undertaking to construct for Fayette Builders a dwelling on another lot owned by Fayette Builders. This latter was known as the Koster (Avenue) house. Better Builders began construction of the latter house as well as one on one of the lots it had acquired from Fayette Builders. This latter was known as the Clays Mill (Clays Mill Road) house. In August of 1955, Better Builders ran into financial difficulties, with the possibility that liens would be imposed by suppliers on one or both of the houses then under construction. An agreement was thereupon made between Better Builders and Fayette Builders whereby Fayette Builders would assume all the then indebtedness against the Koster house and the Clays Mill Road house. A mortgage of $9,500.00 with some additional items brought the total indebtedness against the Clays Mill house to $14,500.00. The correctness of these figures was not challenged by the government. In consideration of Fayette assuming such indebtedness, it was agreed that Better Builders would reconvey the

Clays Mill house and lot to Fayette Builders or to its nominee. Such agreement was reduced to writing under date of August 10, 1955.

On September 27, 1955, an offer to purchase contract was executed by defendant Darnell and Fayette Builders, Inc., whereby Darnell offered to purchase, and Fayette agreed to sell, the Clays Mill house for a stated price of $16,400.00. The body of this contract recited, "as evidence of good faith to bind this contract, the sum of $3,500.00 in checks is deposited with D. Y. Dunn to be applied on the purchase price, upon passing of deed, or refunded * * * if this offer is not accepted. Balance will be paid upon passing of deed from proceeds of FHA loan of not less than $12,-900.00." By special rider the offer to purchase was conditioned as follows:

"It is expressly agreed that, notwithstanding any other provisions of this contract, the purchaser shall not be obligated to complete the purchase of the property, described herein, or to incur any penalty by forfeiture of earnest money deposits or otherwise unless the seller had delivered to the purchaser a written statement issued by the Federal Housing Commissioner setting forth the appraised value of the property for mortgage insurance purposes of not less than $15,900.00 which statement the seller hereby agrees to deliver to the purchaser promptly after such appraised value statement is made available to the seller."

On September 28, 1955, defendant Darnell signed and presented to Franklin Pioneer Corporation, the prospective mortgagee, an FHA application form together with the last mentioned offer to purchase contract. In the FHA form, Darnell represented that $3,500.00 in cash had been already paid on the purchase price, that he intended to occupy the premises to be mortgaged and that his annual income was $7,100.00. Defendant Dunn was not with Darnell when the FHA application form was signed

and presented, and there was no evidence that he participated in the preparation of the FHA forms. Among the papers supporting an FHA application are forms designated Request for Verification of Employment and Employer's Verification. Such a request was addressed to Stanley Fizer Heating Service, as defendant Darnell's employer. Defendant Stanley Fizer signed and delivered such Employer's Verification, completing, or not completing, the answers called for by such form as follows:

Length of time employed: 20 years
Present rate of pay: Annual, $7,-100.00, or hourly, $———

Approximate annual earnings from regular scheduled work: $———

The representation by Darnell that he had paid $3,500 in cash was not true unless he was justified in assuming that his check was the equivalent of cash. He was not so justified, because it was undisputed that he had no such sum in the bank account upon which the check was drawn and had no prospect of having such an amount unless he could realize that sum by disposing of his equity in the home where he then resided. He testified that he hoped he would be able to do so in time to make his check good at the time of closing and that he assumed Dunn would hold his check pending the closing. His representation of a $3,-500.00 down payment was false.

Concerning Darnell's and Fizer's representations as to Darnell's annual earnings being $7,100.00, the only pay actually being received by Darnell was at an hourly rate as an employee of Fizer Heating Service. For the year in question, 1955, his earnings were approximately $4,500.00, which was substantially the case for the previous year of 1954. His tax return for 1955 reported gross income of $4,411.80. Both Darnell and Fizer sought justification for giving a figure of $7,100.00 as Darnell's earnings from the claimed fact, testified by them, that from the formation of the Better Builders, Inc., in 1954, it was agreed that Darnell would have a salary of $50.00 per week for his work for that concern. He was its Secretary and Treasurer. He testified that after finishing his day's work for Fizer Heating Service, he would give attention to the building operations and other affairs of Better Builders, Inc. Nothing was ever paid to Darnell on account of such allegedly agreed salary. Better Builders became insolvent and was liquidated. Fizer and Darnell contended, however, that it was not wrong to add this accruing annual salary of $2,600.00 to Darnell's estimated hourly earnings from Fizer Heating to justify their representation that his annual earnings were $7,100.00. The verification of employment form was addressed to Stanley Fizer Heating Service. Fizer's signed reply could be fairly construed as a representation that Darnell's annual earnings from Fizer Heating Service were $7,100.00. The jury could have found that this was a false representation. We, likewise, are of the opinion that the jury could find Darnell's own representation of his annual income was false.

The errors assigned by the respective defendant-appellants here are: First, that Fizer's motion for a directed acquittal should have been granted; Second, that Dunn's like motion should have been granted; Third, that Darnell is entitled to a new trial; and, Fourth, that if not entitled to directions of acquittal, Fizer and Dunn are entitled to a new trial.

■ 1) *Fizer's motion for directed acquittal.* As stated above, there was sufficient evidence from which the jury could find that Fizer falsely represented Darnell's earnings. If so, he could be found guilty of the charged conspiracy, Count I, and of the substantive offense charged in Count V.

■■ 2) *Dunn's motion for directed acquittal.* Dunn's criminal conduct, charged as one of the overt acts of the conspiracy, Count I, and as a substantive offense in Count IV, where he was

charged jointly with Darnell, arises, if at all, from his signing as an acceptor, and delivering to Darnell, the offer to purchase contract. In effect, he is accused of joining with Darnell in presenting it to the FHA, knowing it to be a false document.

The government charged that contrary to the language of the offer to purchase contract, which called for a sale price of $16,400 to be financed from a down payment of $3,500.00 and an FHA loan of $12,900.00, the real and secret agreement between Darnell and Dunn was that Darnell was to pay only whatever amount he could obtain through an FHA insured loan. As to Darnell, both by his own testimony that he knew the down payment check was not good and the testimony of an FBI agent, who stated that in 1958 Darnell told him that he and Dunn agreed that the $3,500.00 check would never be used, a case was made for the jury as to Darnell's guilt under Counts I and IV. On the trial, Darnell testified that he did not tell Dunn that there were not funds to cover the check at the time it was presented with the offer to purchase. He said he supposed that Dunn believed that the check was good. Dunn, who had paid $14,500 for the property, asserted his belief that Darnell's check was good and testified that he held it pending fulfillment of the conditions of the offer to purchase. These conditions were that a loan of $12,900.00 would be approved and that the FHA appraisal of the property would be not less than $15,900.00. Such conditions were not met as the FHA commitment limited its insurance to a loan of $11,900.00, and its appraisal of the property was $14,500.00. The testimony of Darnell and Dunn was that, being advised that the FHA would only insure a loan of $11,900.00 on the house, they revised their agreement to reduce the price to Darnell to $15,400.00 to be paid with the $3,500.00 down payment and the proceeds of the FHA insured loan. They testified that in consideration for the reduction in price, Dunn would not be required to complete certain improvements that he was to complete as part of the consideration for the price of $16,400.00. The deal was closed on November 16, 1955, by delivery of a deed to Darnell and the execution by Darnell of the FHA insured mortgage of $11,900.00. Dunn and Darnell testified that near the time of closing Darnell advised Dunn that he could not make good his $3,500.00 check without selling his home and suggested that Dunn accept Darnell's equity therein in satisfaction of the down payment. At the closing, Darnell gave Dunn a check for $451.00 which represented the costs of closing the loan. Darnell sought to cash this check, but it was returned for insufficient funds. The $3,500.00 check was not presented for payment, Dunn saying that he was then aware such would be useless. Dunn, accordingly, knew that Darnell's check was not good at the time of closing the loan in November, but, except for Darnell's statement to an FBI agent in 1958, there was no evidence that he knew so when the offer to purchase was signed and presented to the FHA authorities. There was testimony of some efforts of Dunn and Darnell to sell Darnell's Carneal Avenue home to provide money to make good the $3,500.00 down payment obligation. Darnell, however, ultimately withdrew from the deal and by his deed another person was substituted as titleholder of the property involved. The proofs showed that throughout the period following the failure of Darnell to carry out his contract of purchase, and after the transfer of title to the third person, Dunn exercised dominion over the property. He received rent therefrom and at the trial insisted that he was the owner of the property, but had been unable to obtain a reconveyance from the third party titleholder. He characterized the title of such third party as a trusteeship pending Dunn's effort to sell the premises. All in all, the proofs indicated that Dunn may have been guilty of questionable real estate practices after the deal with Darnell fell

through. If Darnell's 1958 statement to an FBI agent was admissible against Dunn, then Dunn's above reviewed conduct would be strong corroboration of the government's claim that the Dunn-Darnell contract was a sham from its inception. However, for reasons hereinafter discussed, we hold that such 1958 admission of Darnell cannot be considered in determining Dunn's guilt. We are of the opinion that without it there was not sufficient evidence to permit a jury to convict Dunn. We have taken notice, too, of some proof of early efforts of Dunn to sell the Clays Mill house for a lower sum than the price to Darnell. It, too, would be corroboration, but does not fill the gap we find in the government's proofs. Dunn was not on trial for conduct unbecoming a real estate dealer or for questionable dealing with the Clays Mill property after his original deal with Darnell fell through. The offense charged was that when he signed an acceptance of Darnell's offer to purchase the property for $16,400.00, he had no such offer because, the government says, there was a secret agreement with Darnell that the real price would be whatever amount Darnell might obtain on an FHA loan. In our opinion, such an agreement cannot be inferred from what was done by Dunn after the deal contemplated by the contract which he signed fell through. The fact that neither the deal represented by the conditional offer to purchase nor the amended agreement, made after the sought for loan was not granted in full amount, was ever actually carried through is not proof that the offer to purchase accepted by Dunn on September 28, 1958, was not, insofar as he was concerned, genuine. If Dunn was guilty of indulging in some shabby makeshifts (a question we need not decide) in the months that followed the failure of consummation of the sale contemplated by the offer which he accepted, such conduct is not proof of criminality in his original acceptance of the offer made to him. If there was competent evidence, admissible against Dunn, that

there was an agreement between him and Darnell that the down payment check for $3,500.00 would be destroyed after an FHA insured loan was approved, such proof would indeed be sufficient to allow the jury to convict him. An agent of the FBI testified that in 1958 Darnell told him that there was such an agreement. This was not admissible against Dunn as a statement by an accomplice or a co-conspirator made in furtherance of a criminal transaction. It occurred in 1958, long after the charged criminal conspiracy of 1955 had terminated. It was not admissible as to Dunn to prove the conspiracy (Count I) nor the substantive offense charged in Count IV. Krulewitch v. United States, 336 U.S. 440, 442, 445, 69 S.Ct. 716, 93 L.Ed. 790; Fiswick v. United States, 329 U.S. 211, 216, 217, 67 S.Ct. 224, 91 L.Ed. 196; Brown v. United States, 150 U.S. 93, 98, 99, 14 S.Ct. 37, 37 L.Ed. 1010.

■ The testimony of the FBI Agent of the damaging admission was not objected to by counsel for Darnell or Dunn. It was hearsay evidence as to Dunn and ordinarily its reception without objection would permit its consideration on the question of Dunn's guilt. Diaz v. United States (1912) 223 U.S. 442, 32 S.Ct. 250, 56 L.Ed. 500; Glenn v. United States, 271 F.2d 880, 883 (CA 6, 1959). However, "where plain error has been committed affecting substantial rights of the accused in a criminal case an appellate court may take notice on its own motion of such error." Glenn v. United States, supra, and cases there cited. Inasmuch as such unobjected to, but inadmissible, evidence was the only evidence sufficient to make a case of Dunn's guilt, we do not consider its admission as harmless error contemplated by Rule 52(a) of the Rules of Criminal Procedure, 18 U.S.C.A. Bollenbach v. United States, 326 U.S. 607, 615, 66 S.Ct. 402, 90 L.Ed. 350. We are constrained to take notice of it, under Rule 52(b).

■ The additional evidence against Dunn might well arouse suspicion and support a speculative conclusion of his

guilt. Indeed it might lead to sophisticated surmise that he was the inspiration of the claimed criminal plan. Such speculation, however, is not sufficient to sustain a judgment of conviction. United States v. Berkley, 288 F.2d 713, 718 (CA 6, 1961); Moore v. United States, 271 F.2d 564, 568 (CA4, 1959); Guevara v. United States, 242 F.2d 745, 747 (CA5, 1958); Wise v. United States, 241 F.2d 545, 547 (CA5, 1957).

■■ In view of the foregoing, we must consider whether it would be procedurally appropriate to direct a judgment of acquittal as to Dunn or to order a new trial. Under the circumstances here, we believe it to be within our discretion to order a new trial, rather than direct an acquittal. Bryan v. United States, 338 U.S. 552; Brandt v. United States, 256 F.2d 79 (CA6, 1958); Gondron v. United States, 242 F.2d 149 (CA 5, 1947); United States v. Nessanbaum, 205 F.2d 93 (CA3, 1953); Gikas v. United States, 250 F.2d 858, 860 (CA1, 1957); Sentner v. United States, 253 F. 2d 310, 311 (CA8, 1958); United States v. Russano, 257 F.2d 712 (CA2, 1958). We are unable from the record before us to determine whether the government, with the FBI agent's testimony excluded as to Dunn, could have provided additional evidence to make a case for the jury as to his guilt. The district judge had the FBI agent's testimony before him in passing on Dunn's motion for an acquittal. We think it appropriate, therefore, to reverse the conviction of Dunn and grant him a new trial. We remand the case as to Dunn for a new trial with the direction that unless the government can introduce additional proof to raise a jury issue as to Dunn's guilt, unaided by the FBI agent's testimony as to Darnell's admissions, the district judge should enter a judgment acquitting Dunn; and in arriving at a determination whether or not a better case can be made upon retrial, the district court shall have the benefit of the assistance of counsel. Brandt v. United States, supra; Sun B. Lee v. United States, 245 F.2d 322 (CA9, 1957); Conrad v. United States, 255 F.2d 247 (CA5, 1958). It is so ordered.

■ 3) *Motions for new trial by Darnell, Dunn and Fizer.* Prejudicial error is charged on the trial court's exclusion of evidence, offered by the defense, supportive of the claim by defendant Darnell that after the FHA loan had been closed he made the first four payments upon the mortgage. The district attorney's opening statement to the jury and testimony by prosecution witnesses laid stress upon the charge that Darnell had made no payments on the mortgage loan. Such evidence was relevant to the government's claim that Darnell never intended to go through with a deal with Dunn or to occupy the Clays Mill property. Darnell testified that he originally intended to occupy the mortgaged property and make the mortgage payments. The government's evidence made a sharp and conspicuous issue of whether Darnell had made any such payments. A government witness, Arnett, was an employee of Franklin Pioneer Corporation. On cross-examination, counsel for Darnell sought to show that payments were made by Darnell. A government objection was sustained because the subject was not germane to the witness' direct examination. In sustaining the objection, the court stated, "what does that have to do with it?" A waiver of the objection followed. However, in a colloquy concerning the materiality of Darnell's payments, his counsel asserted that his making of such payments would indicate that he initially considered himself as the owner of the property. The court rejoined with the observation, "It doesn't make any difference what he considers himself." The government counsel then indicated that he would not object to the subject being pursued, whereupon the following occurred:

"Q. (By Darnell's counsel) Do your records show how many payments were made prior to February 3, 1956?

"A. I thought that card was in here, but I don't seem to find it.

"The Court: I will sustain the objection, (the previous objection had been waived) I don't think it has any real materiality and I'm not going to take the time for him to look it up."

We believe the above events require the granting of a new trial. The prosecution made much of its claim, supported by Darnell's admission to an FBI agent in 1958, that he had made no payments on the mortgage. Even though Darnell and Dunn testified that Darnell did make the first four payments, they were entitled, on this issue, made much of by the government, to the disinterested corroboration by the official records of the mortgagee. Although what occurred did not directly involve Fizer, we think that the jury's appraisal of his defense would be much affected by its impressions of the conduct and credibility of his codefendants and charged coconspirators. All the defendants are entitled to a new trial because of the foregoing. We are not persuaded, as suggested, to treat this matter as insignificant and without prejudice to defendants.

Since there may be a new trial as to Dunn and, in any event, a likelihood that he would be called as a witness on a new trial of the other defendants, we consider other errors charged. Error is assigned on the court's refusal to declare a mistrial because of the district attorney's persistent and repetitious propounding of questions to Dunn, notwithstanding a ruling on each question that its subject matter was not material. The questions suggested misconduct of Dunn. We do not now decide whether such conduct called for a mistrial. This was within the control of the trial judge's discretion. We observe, however, that its repetition on a new trial would expose an intentional and improper effort to prejudice the defendants. Similar conduct has been held to require reversal of a conviction. Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314; Pierce v. United States, 86 F.2d 949 (CA6, 1936); Oliver v. United States, 202 F.2d 521 (CA6, 1953); Ross v. United States, 180 F.2d 160 (CA6, 1950).

We finally mention defendants' claims that they were prejudiced by some instances where the district judge suggested, without prior objection by government counsel, that defense offered testimony was not material. In view of a new trial, at which the complained of events may not reoccur, we need not determine whether prejudice was visited upon the defendants by what occurred. We observe, however, that apparent impatience by the trial judge with defense counsel's presentation of the case may, indeed, lead the jury to believe that the judge is not much impressed with the defense position. The high prestige of the veteran and distinguished judge who presided at the trial of the instant case might indeed impress a jury with the validity of his observations. Starr v. United States, 153 U.S. 614, 14 S.Ct. 919, 38 L.Ed. 841. We have considered other errors assigned, but find no merit in them.

The judgments of conviction of Stanley W. Fizer, Bobbie Baum Darnell and D. Y. Dunn are reversed and the cases remanded for new trials, subject, in the case of Dunn, to the directions hereinabove stated.